# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3269
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Donavan Michael Slagg, | * |
| | * |
| Appellant. | * |
| | * |

_____

No. 10-3369
_____

Appeals from the United States
District Court for the
District of North Dakota.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Gregory Scott Taylor, | * |
| | * |
| Appellant. | * |
| | * |

_____

Submitted:  June 13, 2011
Filed:  August 11, 2011
_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

A federal grand jury returned a superseding indictment charging seven defendants with conspiracy to possess with intent to distribute and to distribute methamphetamine.  Five of the defendants pled guilty.  The superseding indictment also charged six defendants—three of whom also were indicted on the drug conspiracy count—with conspiracy to launder money.  Donavan Slagg and Gregory Taylor, two defendants who were charged with participating in both the drug conspiracy and the money laundering conspiracy, proceeded to trial.  A jury found Slagg guilty of both counts and found Taylor guilty only of the drug conspiracy count.  Both appeal.

## I.    BACKGROUND

This case concerns a loosely knit, non-hierarchical collection of persons who engaged in a series of transactions involving distribution-quantities of methamphetamine in and around Bismarck, North Dakota, from late 2008 to early 2009.  Commencing no later than the fall of 2008, Slagg began supplying a significant number of persons with distribution-quantities of methamphetamine, including Amanda Harper, Levi Foerderer, Jared Reinisch, Billy Crawford, and Clint McBeth.  Taylor, the other appellant in this case, also conducted numerous transactions with Slagg and Ty Zacher, an unindicted co-conspirator.  He also engaged in various

activities demonstrating his knowledge of and cooperation with the charged conspiracy.

During the same 2008-2009 period, another pair of methamphetamine dealers, Joseph Forrest and Robert Chavez, arrived in the Bismarck area from California. Although neither Forrest nor Chavez engaged in direct transactions with Slagg, they cultivated distribution-related relationships with many of Slagg's cohorts, including Bob Zacher, Harper, Engst, Foerderer, and Reinisch. At trial, Forrest testified that Taylor asked him what price he paid per ounce for methamphetamine and that Taylor then "said he was getting them somewhere else in Minnesota . . . a little cheaper than what I said and that if I was willing to meet or beat his price that he would work with me or something." Forrest declined Taylor's offer, although he continued to engage in drug-related ventures with other members of the Bismarck network. Harper helped Forrest sell methamphetamine by introducing him to people interested in purchasing drugs. Foerderer sold quantities of methamphetamine for both Forrest and Chavez, and, on one occasion, Bob Zacher and Foerderer pooled their money with Forrest to purchase methamphetamine from California. That purchase garnered a half pound of methamphetamine, to which Forrest added another half pound of cutting agent. Forrest also traveled to Las Vegas and Colorado on two or three occasions and brought back half-pound to one-pound quantities of methamphetamine. Moreover, at Reinisch's request, Engst traveled with Forrest to California to obtain four ounces of methamphetamine, and, upon their return to North Dakota, she sold at least one ounce on Forrest's behalf.

On January 13, 2009, Slagg was arrested and charged with drug violations under North Dakota law. The state district court judge set his bail at $50,000 cash. Slagg contacted his mother, Tamara Heid, to request her help in getting him out of jail. Slagg and Heid discussed the availability of funds in a series of telephone conversations, recorded by the Burleigh County Jail. Heid repeatedly expressed reluctance to discuss the issue on the telephone, asserting "I cannot go into details about anything on this, on anything, with the phones or anything, okay, I'm not going

to do that, alright?" Gov't Ex. 12, at 4:54-5:04. Harper testified that Slagg did not have a legitimate job at this time and that she, Taylor, and Heid discussed sources for the bail money, including people "who owed [Slagg] money." Additionally, Harper testified that Taylor, Bob Zacher, and Ty Zacher collected the money for Slagg's bail, and a petition for remission, submitted to the Drug Enforcement Administration ("DEA") by Heid, stated that Taylor gave Heid $10,000 and Bob Zacher gave her $9,000. Having assembled the necessary funds, Heid and her companions were reluctant to post the bail. In a telephone call involving Heid, Slagg, and an "unidentified male," the unidentified male characterized the risk of delivering the money as "the only problem right now" and "the one thing" impeding bailing Slagg out of jail. Gov't Ex. 16 at 3:14-3:16, 3:55-3:56. Additionally, the unidentified male twice remarked that using the money as bail would risk it "disappear[ing]." *Id.* at 11:53-11:55, 13:18-13:33. Although a bail bondsman was not necessary to post the bail, Heid ultimately retained two bail bondsmen to deliver the money to the Burleigh County Courthouse and paid them $1,000. Initially, she did not accompany the bondsmen to the court clerk's office, although she soon joined them there when they discovered that the money was $2,000 short. After they located the errant funds, the court clerk informed Heid and the bail bondsmen that one of them would have to sign the requisite IRS currency transaction form. Both Heid and the bail bondsmen manifested reluctance, but one of the bail bondsmen eventually signed the document. Heid then collected Slagg.

On September 24, 2009, a federal grand jury returned a superseding indictment charging Slagg, Taylor, Harper, Bob Zacher, Engst, Forrest, and Chavez with conspiracy to possess with intent to distribute and to distribute methamphetamine, a violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment also charged Slagg, Taylor, Heid,[1] Bob Zacher, and the two bondsmen with conspiracy to launder money, a violation of 18 U.S.C. § 1956(h), arising out of their efforts to post Slagg's bail.

---

[1] We address Heid's appeal in a companion opinion also filed today. *See United States v. Heid*, No. 10-3230.

Finally, the indictment sought forfeiture of property "constituting or derived from any proceeds . . . obtained directly or indirectly as a result of the violations," including the $50,000 posted for Slagg's bail, pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853.

Harper, Engst, Forrest, and Chavez pled guilty to the drug conspiracy count, and Bob Zacher pled guilty to both the drug conspiracy and money laundering conspiracy counts. Slagg and Taylor elected to proceed to trial. At the close of the Government's case-in-chief, both defendants moved pursuant to Fed. R. Crim. P. 29(a) for a judgment of acquittal, which the district court[2] granted only as to the money laundering conspiracy charge against Taylor. The jury found Slagg guilty on both the drug conspiracy and the money laundering conspiracy counts and found Taylor guilty on the drug conspiracy count, making a specific finding that the drug conspiracy in which they had participated involved 500 grams or more of methamphetamine. Both defendants then filed post-trial motions for judgment of acquittal and for a new trial, which the district court denied.

The district court sentenced Slagg to life imprisonment on the drug conspiracy count, the minimum sentence mandated by 21 U.S.C. § 841(b)(1)(A), to be served concurrently with a 240-month sentence on the money laundering conspiracy count. The court sentenced Taylor to 120 months' imprisonment on the drug conspiracy count, the minimum sentence mandated by § 841(b)(1)(A). Both defendants appeal.

---

[2] The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota.

## II.    DISCUSSION

### A. Donavan Slagg

Slagg appeals the district court's denial of his motion for judgment of acquittal on both the drug conspiracy count and the money laundering conspiracy count. We review such a denial *de novo*, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Yarrington*, 634 F.3d 440, 449 (8th Cir. 2011) (quoting *United States v. Scofield*, 433 F.3d 580, 584-85 (8th Cir. 2006)). We will reverse "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Donnell*, 596 F.3d 913, 924 (8th Cir. 2010) (quoting *United States v. Espinosa*, 585 F.3d 418, 423 (8th Cir. 2009)), *cert. denied*, 562 U.S. ---, 131 S. Ct. 994 (2011). Slagg also challenges the denial of his motion for a new trial on sufficiency grounds. We review this denial for abuse of discretion. *United States v. Aguilera*, 625 F.3d 482, 486 (8th Cir. 2010). "The decision to grant or deny a motion for a new trial based upon the weight of the evidence is within the sound discretion of the trial court," but "[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002).

### 1. Drug Conspiracy

"To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007) (quoting *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007)). "An agreement to join a conspiracy 'need not be explicit but may be

inferred from the facts and circumstances of the case,'" *United States v. Rodriguez-Mendez*, 336 F.3d 692, 695 (8th Cir. 2003) (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992)), and "[a] single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions," *United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir.) (quoting *Donnell*, 596 F.3d at 923), *cert. denied*, 562 U.S. ---, 131 S. Ct. 682 (2010). Further, "it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure . . . ." *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993); *see also United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir. 1988) ("This type of enterprise, by its very nature, is a loosely knit organization.").

Slagg challenges the sufficiency of the evidence to support his conviction on three grounds. His first two arguments relate to the threshold issue of whether a single conspiracy existed at all. In Slagg's view, the evidence presented at trial showed no more than a collection of buyer-seller transactions between the members of the alleged conspiracy. At most, Slagg maintains, the evidence showed a series of multiple, smaller conspiracies rather than the single conspiracy charged. And should we determine that the evidence suffices to prove a single conspiracy, Slagg then argues that the evidence is insufficient to show his participation in it. We address each of these points in turn.

Slagg contends, first, that the evidence adduced by the Government supports only a finding of episodic buyer-seller transactions between members of the alleged conspiracy. We disagree because the interdependence of the enterprise's participants provides ample support for a reasonable jury's conclusion that they were working together to pursue "a shared objective to 'sell large quantities of drugs.'" *See United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998) (quoting *United States v. Cabbell*, 35 F.3d 1255, 1262 (8th Cir. 1994)). Indeed, far from suggesting a series of isolated transactions, the trial record is replete with evidence that the conspirators regularly

cooperated with one another, from which a jury could infer "an ongoing, facilitative relationship between parties who were aware of the scope of one another's activities." *See id*. Amanda Harper testified that she sold distribution-quantities of methamphetamine received from Slagg to Levi Foerderer. Harper further testified that she introduced Slagg to Foerderer and helped Joseph Forrest sell methamphetamine in the Bismarck area by introducing him to people who were interested in purchasing drugs. Bob Zacher and Jared Reinisch sold and fronted methamphetamine to Dayna Engst.[3] Engst also testified that, at Reinisch's urging, she traveled with Forrest to California to procure four ounces of methamphetamine, some of which she helped sell upon their return to North Dakota. In addition, Engst testified that she sold methamphetamine for Forrest and Robert Chavez on multiple occasions. Further, Billy Crawford (who received his methamphetamine from Slagg) and Bob Zacher each sold and fronted distribution-quantities of methamphetamine to Bruce Vollmer. *See United States v. Pizano*, 421 F.3d 707, 720 (8th Cir. 2005) (holding that evidence of distribution of large amounts of drugs over extended time period, including fronting transactions, constituted "ample evidence to support a reasonable juror's finding . . . [of] ongoing agreements . . . for the common purpose of distributing [drugs]"). On one occasion when Crawford was unavailable, he put Vollmer in contact with Slagg directly, who then provided Vollmer with three eight-balls[4] of methamphetamine. Foerderer testified that he once sold four eight-balls of methamphetamine on Bob Zacher's behalf at Forrest's request, and, like Engst, Foerderer also sold methamphetamine on behalf of Forrest and Chavez. Moreover, on one occasion, Foerderer, Bob Zacher, and Forrest pooled their money to purchase a half pound of methamphetamine from California. *See United States v. Whirlwind Soldier*, 499 F.3d 862, 869 (8th Cir. 2007) (combining funds to purchase methamphetamine is evidence

---

[3] "Fronting" denotes a transaction in which the buyer receives drugs on credit and repays the seller from the resale proceeds. *United States v. Buckley*, 525 F.3d 629, 631-32 (8th Cir. 2008).

[4] An "eight-ball" refers to one-eighth of an ounce, or approximately 3.5 grams. *United States v. Garcia*, 562 F.3d 947, 550 n.2 (8th Cir. 2009).

of an agreement to distribute). In sum, we agree with the district court that a jury reasonably could conclude that the members of the conspiracy were not engaged simply in a series of isolated transactions but rather were engaged in a "tacit agreement to distribute [drugs] on an ongoing basis and thus were engaged in a common enterprise." *See United States v. Brown*, 414 F.3d 976, 977 (8th Cir. 2005).

Slagg's second contention also relates to the sufficiency of the evidence to support the existence of a single conspiracy. He argues that, even if a jury could infer more than isolated, buyer-seller transactions from the evidence, the evidence at most supports a finding of multiple conspiracies rather than a single, overarching conspiracy. Thus, he maintains, a variance exists between the indictment and the proof offered at trial. But just as the litany of interrelated relationships recounted above could permit the jury to infer more than episodic buyer-seller transactions, so it could permit the jury to infer more than a series of multiple, smaller conspiracies.

A variance between an indictment and the Government's proof at trial occurs if the Government proves multiple conspiracies under an indictment alleging only a single conspiracy. *United States v. Benford*, 360 F.3d 913, 914 (8th Cir. 2004). Whether the Government's proof at trial established only a single conspiracy or multiple conspiracies "is determined by the totality of the circumstances, and because it is a question of fact, we draw all reasonable inferences in favor of the verdict." *United States v. Radtke*, 415 F.3d 826, 838 (8th Cir. 2005). "Relevant factors 'includ[e] the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred.'" *Id.* at 838-39 (quoting *United States v. McCarthy*, 97 F.3d 1562, 1571 (8th Cir. 1996)). If a variance is established, "reversal is warranted only if the variance infringed a defendant's substantial rights." *United States v. McGilberry*, 620 F.3d 880, 885 (8th Cir. 2010) (quoting *United States v. Barth*, 424 F.3d 752, 759 (8th Cir. 2005)).

-9-

The facts recited above in our discussion of Slagg's "buyer-seller" characterization of the enterprise are equally fatal to his "multiple conspiracy" position. Again, the Government's evidence largely involved the same group of individuals working with one another to conduct the same activity, distribution of methamphetamine, in the same location, Bismarck, during the time frame alleged in the indictment, 2008 through early 2009. *See United States v. Cubillos*, 474 F.3d 1114, 1119 (8th Cir. 2007). Further, Slagg's protestations that the alleged members of the conspiracy procured drugs from various sources, sold to different customers, and (according to Slagg) competed with one another are unavailing. "[T]he fact that there may have been multiple sources of [drugs] does not create multiple conspiracies . . . ." *Cabbell*, 35 F.3d at 1262. Likewise, "[o]ne conspiracy may exist despite the involvement of multiple groups and the performance of separate acts," *United States v. Romero*, 150 F.3d 821, 825 (8th Cir. 1998) (quoting *United States v. Riebold*, 135 F.3d 1226, 1230 (8th Cir. 1998)), and we have held that "[d]ealers who compete with one another may be members of the same conspiracy," *Roach*, 164 F.3d at 412; *see also Banks*, 10 F.3d at 1054. Hence, we are unpersuaded that the evidence adduced by the Government supported only a finding of multiple conspiracies, and we reiterate that a reasonable jury could infer a single conspiracy from the totality of the circumstances presented at trial. *See McGilberry*, 620 F.3d at 885.

Third, Slagg challenges the sufficiency of the evidence to prove his participation in the conspiracy, arguing that "[a]ny agreements, if they existed, did not involve Slagg." Having determined that the jury reasonably could infer the existence of a single, overarching conspiracy, we likewise are unpersuaded by Slagg's effort to disassociate himself from the enterprise. "[A] reasonable jury can find that a defendant has more than a mere buyer-seller relationship 'if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers.'" *Donnell*, 596 F.3d at 925 (quoting *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009)). Moreover, it is settled in our circuit that "[t]he evidence is sufficient to support a conspiracy where the drugs were purchased for resale," *Romero*, 150 F.3d

at 826, and that "evidence of multiple sales of resale quantities of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute," *United States v. Garcia-Hernandez*, 530 F.3d 657, 661 (8th Cir. 2008) (quoting *United States v. Eneff*, 79 F.3d 104, 105 (8th Cir. 1996)).

In light of these principles, we conclude that a jury reasonably could infer Slagg's knowing participation in the charged conspiracy based on evidence of his deep involvement with the members of the Bismarck network. Slagg provided Harper distribution-quantities of methamphetamine on multiple occasions, which she sold to Foerderer. Harper also introduced Slagg to Foerderer. Foerderer testified that Slagg fronted him methamphetamine and that, over the course of their business relationship, Slagg sold him between a pound and a pound and a half of the drug. *See Parker*, 554 F.3d at 239 ("The selling group's interest in [the buyer's] sales was demonstrated further by the fact that they provided him with drugs on credit, relying on his ability to resell to secure payment to themselves."). Further, according to witness Valinda Tyndall, Slagg and Foerderer traveled to Beulah, North Dakota, to purchase between four and six ounces of methamphetamine.[5] Tyndall also testified that Slagg purchased

---

[5] To the extent Slagg challenges Tyndall's credibility and urges that "[n]o reasonable jury could give credence to Tyndall's painful testimony," we observe that it is not the province of a court tasked with reviewing a conviction's evidentiary sufficiency to "weigh the evidence or the credibility of the witnesses. Rather the jury has sole responsibility for resolving conflicts or contradictions in testimony, and we must resolve credibility issues in favor of the verdict." *United States v. Frausto*, 616 F.3d 767, 772 (8th Cir. 2010) (quoting *United States v. Honarvar*, 477 F.3d 999, 1000 (8th Cir. 2007)), *cert denied*, 562 U.S. ---, 131 S. Ct. 1703 (2011). By contrast, "[i]n ruling on a motion for a new trial . . . a district court has discretion to 'weigh the evidence and evaluate the credibility of the witnesses,' but the court must allow the verdict to stand unless a miscarriage of justice may have occurred." *United States v. Coplen*, 533 F.3d 929, 931 (8th Cir. 2008) (quoting *United States v. Sturdivant*, 513 F.3d 795, 800 (8th Cir. 2008)). The district court, in its order denying Slagg's post-verdict motion, determined that "[a]lthough some evidence may have weighed in favor of acquittal, there was also sufficient evidence to justify a conviction," and we cannot

distribution-quantities of methamphetamine from Bob Zacher. In addition, Engst testified that she received methamphetamine in quantities ranging from 3.5 grams to 7 grams over the course of six to eight months from Reinisch, who told her that he received the drugs from Slagg. Likewise, Vollmer testified that he received distribution-quantities of methamphetamine from Crawford, who received the drugs from Slagg. Moreover, on one occasion when Crawford was unavailable, he put Vollmer in contact with Slagg directly, who then provided Vollmer with three eight-balls of methamphetamine. *See Banks*, 10 F.3d at 1054 (observing that an "important consideration" in determining membership in a conspiracy is "whether the actor 'demonstrated a substantial level of commitment to the conspiracy, [for example] by engaging in a consistent series of smaller transactions' that further its ultimate object of supplying the consumer demand of the market" (alteration in original) (quoting *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir. 1991))).[6]

Viewing this evidence in the light most favorable to the Government, we conclude that a reasonable jury could have concluded beyond a reasonable doubt that Slagg was a knowing participant in the charged conspiracy.[7] Hence, the district court

say that the court abused its discretion in reaching this conclusion.

[6] Slagg places great emphasis on the fact that he never engaged in drug transactions with Forrest and Chavez and, indeed, that Forrest affirmatively declined to associate directly with Slagg. But the fact that Slagg did not pursue drug-related ventures with every member of the conspiracy does not detract from the weight of the evidence showing his participation in it. "A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." *United States v. Ramon-Rodriguez*, 492 F.3d 930, 941 (8th Cir. 2007) (quoting *United States v. Smith*, 450 F.3d 856, 860 (8th Cir. 2006)).

[7] Slagg also contends that, "[e]ven if the evidence is deemed sufficient to prove Slagg knowingly entered into a drug conspiracy of some sort, the evidence still does not prove Slagg's involvement in a conspiracy to possess with intent to distribute or distribute 500 grams or more of methamphetamine." Because the Government

did not err in denying Slagg's motion for judgment of acquittal and likewise did not abuse its discretion in refusing to grant Slagg a new trial.

### 2. Money Laundering Conspiracy

We now turn to Slagg's conviction for conspiracy to launder money. Conspiring to launder money in violation of 18 U.S.C. § 1956(h) requires that the defendant "agreed with another person to violate the substantive provisions of the money-laundering statute . . . ." *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006); *see also Pizano*, 421 F.3d at 725. The charged object of the conspiracy in the present case was violation of the transaction provision of the money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i).

> There are four elements to this offense: (1) defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) defendant knew the property represented proceeds of some form of unlawful activity; and (4) defendant conducted or attempted to conduct the financial transaction knowing the transaction was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

*United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008) (quoting § 1956(a)(1)(B)(i)). The financial transaction identified in the indictment was "[t]he posting of $50,000 cash at the Burleigh County Courthouse . . . for the bond of Donavan Michael Slagg." On appeal, Slagg challenges the sufficiency of the evidence to prove the second and fourth elements enumerated in *Phythian*.

---

presented evidence of Slagg's personal participation in transactions with co-conspirators involving a total amount of methamphetamine well in excess of 500 grams, we agree with the district court that a jury reasonably could conclude that Slagg participated in a conspiracy involving 500 grams or more of methamphetamine.

-13-

First, Slagg contends that the evidence is insufficient to prove that the money "represented proceeds of . . . unlawful activity," specifically, drug sale proceeds. Proof that the funds were drug proceeds may be established by circumstantial evidence, *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990), and in the present case there was ample circumstantial evidence to allow a reasonable jury to infer that at least some of the funds gathered for Slagg's bail were drug proceeds. The Government presented recorded telephone conversations between Slagg and Tamara Heid, his mother, in which they discussed the sources of funds and Heid asserted "I cannot go into details about anything on this, on anything with the phones," Gov't Ex. 12 at 4:54-5:00, "the best thing for us to do is not even talk on the phone," Gov't Ex. 14 at 1:36-1:39, "I cannot talk on these phones," *id.* at 2:29-2:31, "I'm not even supposed to be talking about anything on the phone," *id.* at 5:11-5:15, "I'm not even supposed to say anything over the phone about what time I'm supposed to get together with anybody," Gov't Ex. 19 at 1:03-1:08, and "I'm not even supposed to be talking about nothing," *id.* at 3:53-3:56.[8]   Additionally, an "unidentified male" who participated in a conversation with Slagg and Heid twice expressed concern that posting the funds would cause them to "disappear," Gov't Ex. 16 at 11:53-11:55, 13:18-13:33, a statement that the jury reasonably could interpret as a reference to the risk that the money would be seized as drug proceeds. Further, Harper testified that Slagg, a drug dealer, did not have a legitimate job and that she, Heid, and Taylor (also a drug dealer) discussed "who owed [Slagg] money" when considering how to gather the funds to post Slagg's bail. *See United States v. Herron*, 97 F.3d 234, 237 (8th Cir. 1996) ("From the evidence substantiating the appellants' drug-trafficking activity and their lack of any legitimate source of income, it was reasonable for the jury to infer that the wired money constituted drug proceeds."); *Blackman*, 904 F.2d at 1257. Thus—based on the pointedly guarded telephone conversations, Slagg's drug-dealing activities and otherwise unemployed status, and the conversation regarding collecting

---

[8] Because the audio recordings, not the transcripts, constituted the evidence in this case, we rely upon them in assessing the sufficiency of the evidence.

the necessary funds from people who owed Slagg money—we conclude that a jury reasonably could find that the money used to post Slagg's bail derived, at least in part, from proceeds of unlawful activity.

Second, Slagg argues that the evidence is insufficient to prove that he knew that the bail-posting transaction was "designed in whole or in part . . . to conceal or disguise" a listed attribute of the money. Interpreting the analogous transportation provision of the money laundering statute, which prohibits the transportation of certain criminal proceeds into or out of the United States "knowing that such transportation . . . is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds, 18 U.S.C. § 1956(a)(2)(B)(i), the Supreme Court held in *Cuellar v. United States* that the statute's "design" element "requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute" of the funds. 553 U.S. 550, 567 (2008); *see also United States v. Williams*, 605 F.3d 556, 564-65 (8th Cir. 2010) (finding *Cuellar*'s holding applicable to the transaction provision of the money laundering statute).[9]  Thus, the Government must show that concealment is an "intended aim" of the transaction, *Cuellar*, 553 U.S. at 564, whether from direct evidence or circumstantial evidence, *United States v. Cruzado-Laureano*, 404 F.3d 470, 484 (1st Cir. 2005); *see also Blackman*, 904 F.2d at 1257.

Relying on *Cuellar*, Slagg contends that the evidence presented at trial permits a reasonable finding only that the sole purpose of the agreement was to bail him out of jail. Were this the case, we would agree that the transaction would not violate the money laundering statute, as we repeatedly have held that "the money laundering statute may not be so broadly construed that it becomes a 'money spending statute.'" *United States v. Shoff*, 151 F.3d 889, 892 (8th Cir. 1998) (quoting *United States v.*

---

[9] Of course, concealment need not be the sole purpose of the transaction; the statute requires only that the transaction be designed "in whole *or in part*" to conceal. § 1956(a)(1)(B) (emphasis added); *see also Cuellar*, 553 U.S. at 566 n.7.

*Herron*, 97 F.3d 234, 237 (8th Cir. 1996)); *see also United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995). However, the evidence in this case permits a jury reasonably to infer that Slagg knew that the transaction also was intended, at least in part, to conceal the money's listed attributes. In one of the recorded telephone calls Slagg, Heid, and an "unidentified male" discussed the risks in bringing the bail money to the county courthouse. The unidentified male informed Slagg that "it's a matter of waiting for somebody to bring it [the money] into there [the courthouse]," Gov't Ex. 16 at 1:31-1:37, and characterized the risk of delivering the money as "the only problem right now," *id.* at 3:14-3:16, and "the one thing" impeding bailing Slagg out of jail, *id.* at 3:55-3:56. When Slagg suggested that "somebody . . . come bring it [the money] here," the unidentified male responded, "I'm worried about that [the money] just disappearing then." *Id.* at 13:18-13:33. The unidentified male also remarked, "I don't want it the other way [*i.e.*, posting the bail rather than using the funds to retain an attorney] and it all to disappear." *Id.* at 11:53-11:55. No more than seventeen minutes after the conclusion of his conversation with Heid and the unidentified male, Slagg had a conversation with Harper, who informed him that Derle Marchus, the bail bondsman, "said he would do it for a thousand dollars." Gov't Ex. 17 at 2:04-2:08. Slagg replied that "everything is there. But they just don't have nobody to post it." *Id.* at 4:36-4:40. From these conversations, a jury reasonably could infer that Slagg knew that his cohorts planned to conduct the transaction in such a way as to "conceal or disguise the nature, . . . the source, the ownership or the control" of the money and reduce the risk of the money's "disappearing"—that is, later being seized as drug proceeds. *See* § 1956(a)(1)(B)(i); *see also Cruzado-Laureano*, 404 F.3d at 483 (remarking that evidence of intent to disguise or conceal can derive from "circumstantial evidence, like the use of a third party to disguise the true owner, or unusual secrecy."); *cf. United States v. Shoff*, 151 F.3d 889, 892 (8th Cir. 1998) (observing that a "common type of money laundering" is "the use of [unlawful] proceeds to buy assets in another person's name").

Accordingly, we conclude that the district court did not err in denying Slagg's motion for judgment of acquittal and that it did not abuse its discretion in refusing to grant Slagg a new trial on this basis.

## B. Gregory Taylor

Taylor first challenges the sufficiency of the evidence to support his conviction for conspiracy to possess with intent to distribute and to distribute methamphetamine. Unlike Slagg, Taylor does not argue that a conspiracy did not exist; rather, he contends that the evidence failed to connect him to the conspiracy and established only that he engaged in discrete buyer-seller transactions with alleged co-conspirators.

To prove that Taylor participated in the charged conspiracy, the Government was required to present evidence "establish[ing] some degree of knowing involvement and cooperation," *Cabrera*, 116 F.3d at 1244 (quoting *United States v. Fregoso*, 60 F.3d 1314, 1323 (8th Cir. 1995)), beyond "a mere sales agreement with respect to contraband," *United States v. West*, 15 F.3d 119, 121 (8th Cir. 1994). In considering what evidence is sufficiently "beyond the mere sales agreement," *id.*, we have concluded that "evidence of multiple sales of resale quantities of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute." *Eneff*, 79 F.3d at 105. By contrast, "even numerous sales of small amounts of drugs for personal use are insufficient to support a conviction for some larger conspiracy," *id.*, absent "independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy," *United States v. Vinton*, 429 F.3d 811, 816 (8th Cir. 2005) (quoting *United States v. Prieskorn*, 658 F.2d 631, 635 (8th Cir. 1981)).

Taylor contends that the evidence is insufficient to show his participation in the conspiracy because it establishes only that he engaged in discrete transactions involving personal-use quantities of methamphetamine. We disagree with this characterization of the evidence. Shannon Krueger testified that, over the course of

-17-

her three-year relationship with co-conspirator Ty Zacher ending in October 2008, Ty Zacher would visit Taylor to purchase methamphetamine "once [or] twice a week." Krueger also testified that she accompanied Ty Zacher to Taylor's house on approximately twelve occasions and that Taylor sold Zacher methamphetamine in quantities ranging from "[a] half ounce to an ounce." Harper testified that she accompanied Slagg to Taylor's house and Slagg provided Taylor "a couple eight-balls" of methamphetamine. Moreover, according to the testimony of DEA Special Agent Marc Laurie, a typical dosage amount of methamphetamine is "in less than a gram quantity," and witness Bruce Fleck confirmed that a half gram of methamphetamine was a "[u]ser-type quantit[y]." As a result, a reasonable jury could conclude that the half-ounce and ounce quantities supplied to Ty Zacher, at least, constituted resale quantities of methamphetamine. *See United States v. Pruett*, 501 F.3d 976, 985 (8th Cir. 2007) (remarking that, "[a]s one ounce equals approximately 28.35 grams[,] . . . [i]t was reasonable for the jury to infer that the [one-ounce] quantit[ies] of drugs . . . w[ere] purchased for resale and not for personal use"), *vacated on other grounds*, 552 U.S. 1241 (2008); *United States v. Schindler*, 77 F.3d 245, 246-47 (1996) (per curiam) ("Expert testimony established that a half-ounce of methamphetamine was an amount associated with distribution, rather than personal use.").

In any event, the Government presented additional, "independent evidence tending to prove that the defendant had some knowledge of the scope of the conspiracy," *Fregoso*, 60 F.3d at 1323 (quoting *Prieskorn*, 658 F.2d at 635), from which the jury reasonably could infer Taylor's "knowing involvement and cooperation," *see Cabrera*, 116 F.3d at 1244 (quoting *Fregoso*, 60 F.3d at 1323). Forrest testified that Taylor asked him what price he paid per ounce for methamphetamine and that Taylor then "said he was getting them somewhere else in Minnesota . . . a little cheaper than what I said and that if I was willing to meet or beat his price that he would work with me or something." Although Forrest declined Taylor's suggestion, a jury could infer from the exchange that Taylor knew that

Forrest was a distributor of methamphetamine and sought to work with him directly. *See United States v. Miranda-Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991). In addition, the Government presented evidence that, after Slagg was arrested on state drug charges, Taylor, Bob Zacher, and a third man took Valinda Tyndall "for a drive" during which they told her that "[she] should just not say anything to anybody." Tyndall characterized Taylor's demeanor as "intimidating" and testified that he insisted that "he was sure that [Tyndall] had talked to the police." *See Donnell*, 596 F.3d at 921 (holding that evidence of defendant's role as "enforcer" "buttress[ed] the conclusion that [he] was an active participant in the conspiracy"). Further, Harper testified that Taylor, Bob Zacher, and Ty Zacher collected the money for Slagg's bail and that she, Heid, and Taylor discussed gathering money from people who owed Slagg money. *Cf. United States v. Zerba*, 21 F.3d 250, 252 (8th Cir. 1994) (relying, in part, on evidence that defendant acted as drug debt collector for another in holding evidence sufficient to support conspiracy conviction). The Government also introduced a petition for remission, submitted to the DEA by Heid, which stated that Taylor gave Heid $10,000 to help bail Slagg out of jail. *See Fregoso*, 60 F.3d at 1325 (relying, in part, on evidence that the defendant "provided the bail money" when an alleged co-conspirator "was arrested . . . on an unrelated drug charge" in holding evidence sufficient to support conspiracy conviction); *see also United States v. Woodard*, 88 F. App'x 154, 155 (8th Cir. 2004) (unpublished per curiam). Thus, granting the verdict the benefit of all reasonable inferences, we conclude the totality of the evidence against Taylor was sufficient to support the jury's verdict.

Second, Taylor argues that the district court should have instructed the jury that a buyer-seller relationship alone is insufficient to create a conspiracy. We review a district court's jury instructions for abuse of discretion, *United States v. Faulkner*, 636 F.3d 1009, 1019 (8th Cir. 2011), and "[w]e will reverse a jury verdict when the errors misled the jury or had a probable effect on the jury's verdict," *id.* at 1019-20 (quoting *United States v. Pereyra-Gabino*, 563 F.3d 322, 328 (8th Cir. 2009)). Defendants are entitled to an instruction explaining their theory of the case if the request is timely

made and if the proffered instruction is supported by the evidence and correctly states the law. *United States v. Adams*, 401 F.3d 886, 898 (8th Cir. 2005). Here, there is no question that Taylor timely requested the proposed instruction, and the Government does not appear to dispute that the proposed instruction correctly stated the law. Thus, the issue before us is whether the instruction was supported by the evidence.

The proposed instruction regarding the buyer-seller relationship stated "you are . . . instructed that the mere fact that there may have been shown a relationship between a buyer and seller of drugs . . . does not, in and of itself, establish a conspiracy." Taylor asserts that "the evidence in this case proves at best that Taylor provided small quantities of drugs to a couple of friends for personal use and that he was a methamphetamine user." We agree with the district court, however, that the evidence does not support this assertion. Krueger testified that, over the course of her three-year relationship with Ty Zacher, Zacher received methamphetamine from Taylor "once, twice a week," and, on the occasions Krueger accompanied Zacher to Taylor's house, Zacher would purchase between "[a] half ounce to an ounce" of methamphetamine. *See Faulkner*, 636 F.3d at 1021 (holding it was not an abuse of discretion to deny a proposed buyer-seller jury instruction where Government presented evidence that defendant sold crack cocaine "well over 100 times" and heroin on "five or six occasions"). Moreover, Taylor engaged in numerous drug transactions with Slagg, participated with Bob Zacher in an effort to dissuade Tyndall from talking to the police, helped gather money for Slagg's bail, and provided $10,000 to bail Slagg out of jail. Again, this evidence does not support Taylor's theory that he simply engaged in discrete buyer-seller transactions. Accordingly, the district court did not abuse its discretion in refusing to give Taylor's proposed jury instruction.

Third, Taylor contends that the district court erred in admitting an alleged "mug shot" photograph of Taylor. "Although we do not endorse the admission of mugshots as evidence, we have not adopted a per se rule requiring reversal." *Cox v. Wyrick*, 642 F.2d 222, 227 (8th Cir. 1981) (internal citations omitted). Taylor urges us to review

his claim for plain error, noting that "[t]his court reviews for plain error the admission of evidence to which the defendant did not object below." However, this is not a case where the defendant neglected to raise a timely objection; rather, Taylor objected to the admission of the photograph but later withdrew his objection. We have held that "[t]he plain error standard only applies when a defendant inadvertently fails to raise an objection in the district court." *United States v. Thompson*, 289 F.3d 524, 526 (8th Cir. 2002). "The Supreme Court has distinguished between a right that is inadvertently left unasserted and one that is intentionally relinquished or abandoned, noting that the latter constitutes a waiver that extinguishes a claim altogether." *United States v. Gutierrez*, 130 F.3d 330, 332 (8th Cir. 1997) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)). Thus, in light of Taylor's affirmative withdrawal of his objection, we conclude that his claim is waived.

Finally, Taylor argues that the district court erred in entering an order of forfeiture for the $50,000 gathered for Slagg's bail, $10,000 of which were contributed by Taylor. The superseding indictment contained a forfeiture count in which, as relevant to the present appeal, the Government sought the following: upon the conviction of Slagg of the drug conspiracy alleged in Count 1 or upon the conviction of Slagg or Taylor of the money laundering conspiracy alleged in Count 2, the Government would seek forfeiture of

> any and all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the violations and any and all property used or intended to be used in any manner or part to commit or to facilitate the commission of the violations alleged in Counts One and Two . . . , including, but not limited to . . . [the $50,000 posted for Slagg's bail].

As noted above, the district court granted Taylor's motion for acquittal on the money laundering conspiracy count, and the jury found Taylor guilty on the drug conspiracy count and Slagg guilty on both the drug conspiracy and the money laundering conspiracy counts. Following the return of the jury's verdict, Taylor's attorney

-21-

represented to the district court that "[Taylor] has agreed to waive his right to challenge the criminal forfeiture at this time." The district court later issued an order of forfeiture for the $50,000, which predicated forfeiture on the jury's finding Slagg and Taylor "guilty of the crime(s) giving rise to the forfeiture of the property" and noted that both Slagg and Taylor "agree[d] to the forfeiture in open court." Taylor raised no objection to the order of forfeiture at any time before the district court. On appeal, he now argues that the district court erred in ordering the forfeiture against him. He contends that the indictment only provided notice that his property would be subject to forfeiture upon his conviction on the money laundering conspiracy count but that it did not state that his property would be subject to forfeiture upon his conviction on the drug-conspiracy count. Because he was acquitted of the money laundering conspiracy, Taylor argues that the district court "order[ed] forfeiture on an acquitted count."

The Government responds that the district court did not enter an order of forfeiture against Taylor that was predicated upon the money laundering conspiracy. Rather, the Government maintains that the district court and all the parties uniformly understood the indictment to provide notice that the Government would seek forfeiture of Taylor's property upon his conviction of either the drug conspiracy or the money laundering conspiracy. Thus, in the Government's view, the district court entered the order of forfeiture against Taylor based on the drug conspiracy count of which he was convicted, *not* the money laundering conspiracy count of which he was acquitted. Despite the seemingly irreconcilable premise upon which his argument on appeal is based, Taylor nonetheless concurs with the position taken by the Government, acknowledging that "[t]he district court, counsel for the government and Taylor's trial counsel . . . all apparently operat[ed] under the mistaken belief that the Superseding Indictment provide [sic] for forfeiture against Taylor on the basis of conviction on Count One [the drug conspiracy charge]." Accordingly, to the extent Taylor requests that we resolve the propriety of the district court's entering an order

of forfeiture predicated on an acquitted count, Taylor and the Government appear to be in agreement that the district court did no such thing.[10]

## III.  CONCLUSION

For the foregoing reasons, we affirm.

_____

---

[10] Whether the indictment provided proper notice that the Government would seek forfeiture of Taylor's property upon his conviction on the drug conspiracy count—and, if not, whether the district court plainly erred when it ordered forfeiture based on that conviction—is a different question and one that Taylor has affirmatively disavowed.  *See* Taylor Rep. Br. 18 ("The government characterizes Taylor's fourth issue on appeal as an argument that 'the Superseding Indictment did not provide proper notice for forfeiture as the proceeds of illegal drug sales.'  This is not correct." (citations omitted)).  Cognizant that "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present," *Greenlaw v. United States*, 554 U.S. 237, 243 (2008), we shall refrain from addressing this issue.