# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-2002

_____

United States of America

*Plaintiff - Appellee*

v.

Deshonte Antwon Dickson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: February 14, 2023
Filed: June 15, 2023

_____

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.

_____

LOKEN, Circuit Judge

A March 2017 Superseding Indictment charged Deshonte Antwon Dickson, Vernon Curry, and David Taylor with conspiracy to distribute and possess with intent to distribute heroin and 500 grams or more of methamphetamine from the summer of 2016 to the date of the indictment. See 21 U.S.C. §§ 841(a)(1), 841(b)(1), 846; 18 U.S.C. § 2. Zachariah Boelter was charged with being a member of the conspiracy

but for a reasonably foreseeable amount of only 50 grams or more of methamphetamine.

Before Dickson's trial, Curry pleaded guilty to a different conspiracy charge; Boelter and Taylor pleaded guilty to participating in this conspiracy. After a three-day trial, the jury convicted Dickson of conspiracy to distribute heroin and between 50 and 500 grams of methamphetamine. Boelter testified for the government. Curry testified for the defense. Taylor did not testify. At sentencing, the district court, varying upward from the advisory guidelines sentencing range, imposed a sentence of 120 months imprisonment plus four years of supervised release. Dickson appeals. He argues the evidence was insufficient to sustain the conspiracy conviction. We conclude there was sufficient evidence to support the jury verdict. Dickson also argues the district court committed procedural sentencing error when it adopted the Presentence Investigation Report ("PSR") and without adequate notice varied upward for reasons that contradicted the PSR's fact findings. We agree with this contention. Accordingly, we affirm Dickson's conviction and remand for resentencing.

## I. Sufficiency of the Evidence

We review a challenge to the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the jury's verdict and reversing only if no reasonable jury could have found Dickson guilty beyond a reasonable doubt. United States v. Peeler, 779 F.3d 773, 774 (8th Cir. 2015). To establish that Dickson conspired to distribute heroin and methamphetamine, the government must prove beyond a reasonable doubt: (1) there was a conspiracy -- an agreement -- to distribute the drugs; (2) Dickson knew of the conspiracy; and (3) Dickson intentionally joined the conspiracy. United States v. Slagg, 651 F.3d 832, 840 (8th Cir. 2011); see 21 U.S.C. §§ 841(a)(1), 846.

Dickson does not dispute there was evidence of a conspiracy between co-defendants Curry, Taylor, and Boelter to distribute drugs. "At issue, therefore, is whether there was sufficient evidence that [Dickson] knew of the conspiracy and knowingly became a member of the conspiracy." United States v. Huggans, 650 F.3d 1210, 1222 (8th Cir. 2011). Agreement to join a conspiracy may be inferred from the facts and circumstances of the case and may be based on "a loosely knit, non-hierarchical collection of persons who engaged in a series of transactions involving distribution-quantities of drugs in and around a particular city over a course of time." United States v. Hamilton, 929 F.3d 943, 946 (8th Cir. 2019) (cleaned up). "One conspiracy may exist despite the involvement of multiple groups and the performance of separate acts." Slagg, 651 F.3d at 842 (cleaned up).

Inspector Thomas Irvin of the United States Postal Service ("USPS") testified that in mid-August 2016, Detective David Stewart of the North Dakota Metro Area Narcotics Task Force alerted Irvin that packages of methamphetamine and heroin were being mailed to Zachariah Boelter in Bismarck. On August 24, Irvin learned that a fictitious person in Bakersfield, California had mailed Boelter a Priority Mail package. Irvin and Stewart intercepted the package in North Dakota. A warrant search uncovered 310.04 grams of methamphetamine and 72.98 grams of heroin in vacuum-sealed Ziploc bags. Officers completed a controlled delivery of the package to Boelter on August 26. Irvin admitted that surveillance videos showed Dickson did not mail the intercepted package to Boelter.

Irvin learned from a thorough review of USPS records that fictitious persons in Bakersfield or nearby Indio had sent Boelter nine packages from February to August 2016 ("the Boelter packages"). One was part of a two-package transaction on June 8; the other package was sent to David Hollingshead in Bismarck ("the Hollingshead package"). A common IP address was used to track the Boelter packages, the Hollingshead package, seven packages sent from "Montero Court" in Bakersfield to Dickinson, North Dakota, and 12 other packages sent from Bakersfield

to Dickinson. Dickson was a Bakersfield resident with ties to North Dakota. Irvin learned that Dickson's California and North Dakota driving records listed his addresses as "Montaro Court" in Bakersfield and "C Street" in Dickinson. On cross exam, Irvin admitted he could not identify the sender of the "Montero Court" packages and could not link the common IP address to a specific subscriber.

Boelter, appearing as a cooperating witness, testified that in early 2016 he frequently bought personal amounts of heroin from Vernon Curry when Curry -- known to Boelter as "Mac" -- traveled to Bismarck from California. In late February or early March 2016, Mac "fronted" Boelter about one ounce of heroin, a larger quantity. Boelter paid Mac's girlfriend $5,000 for the heroin when she came to his house to collect after Curry was arrested for another drug conspiracy. Later that day, Boelter met Taylor and his girlfriend, Mac's sister, April Day. Taylor and Day fronted Boelter 40 grams of heroin that Mac had left in a Bismarck storage unit.

In the ensuing months, Taylor traveled to North Dakota several times to front Boelter heroin and collect distribution proceeds. Eventually, Taylor started sending Boelter heroin and methamphetamine in the mail. Boelter testified he received "five, maybe six" packages from Taylor in total, including the August 2016 intercepted package. After Boelter sold the fronted drugs, Taylor would come to North Dakota in a rental car to collect the proceeds. On September 8, officers arrested Taylor in Bismarck after Boelter met Taylor in his rental vehicle to pay for the drugs in the intercepted package. A search of Taylor's rental vehicle uncovered an Avis rental agreement listing Dickson as the customer and Taylor as an additional driver. Investigation revealed that Dickson rented vehicles four times in 2016 for long-distance trips between Bakersfield and Bismarck for Dickson, Taylor, or both, with Taylor listed as an additional driver on three rental agreements. On cross-exam, Boelter testified that he did not know Dickson and Taylor never mentioned Dickson.

David Hollingshead pleaded guilty to a different conspiracy and, like Boelter, testified for the government as a cooperating witness. Hollingshead testified that he sold large quantities of methamphetamine in the Bismarck area between May 2015 and January 2016. He began purchasing methamphetamine from Vernon Curry, who Hollingshead knew as "Mac," in 2014 and 2015 when Hollingshead's main supplier was unavailable. In mid-2015, Mac introduced Hollingshead to Dickson as a substitute supplier. Dickson, known to Hollingshead as "Cuzo," fronted Hollingshead two ounces of methamphetamine for resale at a parking lot in Bismarck, returned to California, and mailed Hollingshead about four ounces of methamphetamine.

On cross exam, Hollingshead acknowledged that he only identified Dickson as "Cuzo" after Detective Stewart showed Hollingshead a photo of Dickson. In a February 2019 hearing in the other conspiracy case, Hollingshead had testified that his alternate supplier "goes by the alias of Cuzo and Mac." Curry testified for the defense that he went by "Mac" and "Cuzo" -- he was the "*only* Cuzo." Curry asserted that Dickson, a "close family friend," never participated in Curry's drug dealing. He denied introducing Dickson to Hollingshead or anyone else in the drug dealing business. He knew that his sister and Taylor, her boyfriend, sold drugs in North Dakota but "has no information" that Dickson was involved.

In October 2015, Hollingshead testified that Cuzo (Dickson) returned to Bismarck and fronted "a couple ounces of methamphetamine, a couple hundred hydrocodone pills, and about an ounce of heroin." Shortly after this exchange, Hollingshead "cut ties" with Curry when his associate invaded Hollingshead's home. Dickson continued mailing Hollingshead drugs, sending several packages from California between January and November 2016. Consistent with the mailing records evidence, Hollingshead testified that one package containing several ounces of methamphetamine was sent to his duplex in Bismarck on June 8, 2016 (the "Hollingshead package"). In September or October 2016, Dickson mailed

Hollingshead another package containing approximately 67 grams of methamphetamine and seven grams of heroin to a different address in Bismarck.

Detective Stewart testified that records from a hotel in Bismarck revealed that Dickson and Taylor stayed there at the same time June 10 to 13, 2016, and again from July 19 to 20, 2016, consistent with two of Dickson's long-distance vehicle rental agreements. On cross exam, Stewart admitted that Taylor never identified Dickson as being involved in his drug distribution activities and that another person who received drug packages from "Cuzo" did not identify Dickson as Cuzo.

At the close of the evidence, the district court denied Dickson's oral motion for a judgment of acquittal. See Fed. R. Crim. P. 29. The jury acquitted Dickson of conspiracy to distribute 500 or more grams of methamphetamine but found him guilty of conspiracy to distribute heroin and between 50 and 500 grams of methamphetamine. The district court denied Dickson's post-verdict Criminal Rule 29 motion for an acquittal.

On appeal, Dickson argues there is insufficient evidence to sustain his conspiracy conviction because the only evidence of his involvement in any narcotics transactions came from Hollingshead's unreliable testimony. "We have repeatedly upheld jury verdicts based solely on the testimony of conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony." United States v. Buckley, 525 F.3d 629, 632 (8th Cir. 2008) (citations omitted). Defense counsel thoroughly cross examined Hollingshead, highlighting inconsistencies in his past statements to law enforcement. The jury was in the best position to assess the credibility of Hollingshead and the other witnesses. We will not disturb the jury's credibility findings on appeal. United States v. Mayfield, 909 F.3d 956, 963 (8th Cir. 2018).

Dickson also argues that, even if believed, Hollingshead's testimony proves only that he occasionally purchased methamphetamine and heroin from Dickson when his main supplier was unavailable, and this proves only a buyer-seller relationship that does not tie either party to a conspiracy. See United States v. Prieskorn, 658 F.2d 631, 636 (8th Cir. 1981). Buyer-seller relationships "involve only evidence of a single transient sales agreement and small amounts of drugs consistent with personal use." Huggans, 650 F.3d at 1222 (cleaned up). This is a "narrow category" of cases. Peeler, 779 F.3d at 776. Hollingshead's testimony, if credited, establishes much more than "a single transient sales agreement" between Hollingshead and Dickson. Hollingshead testified that Dickson repeatedly fronted Hollingshead large quantities of methamphetamine for resale. Hollingshead's frequent purchases of resale quantities from Dickson, in-person and through the mail, is sufficient to support a conspiracy conviction. See, e.g., Slagg, 651 F.3d at 842.

The trial evidence also revealed that Dickson's drug deals with Hollingshead were connected to a larger drug conspiracy involving Dickson, Boelter, Curry, and Taylor. Curry introduced Dickson to Hollingshead, and the same IP address was used to track the June 8 Hollingshead package, the Boelter packages, and various other packages sent from fictitious persons and addresses in Bakersfield to North Dakota, suggesting one overarching drug dealing conspiracy. Hotel and car rental records show that Dickson also rented vehicles and hotel rooms for four trips from Bakersfield to Bismarck, including the vehicle that Taylor used to collect proceeds for the intercepted Boelter package. Dickson and Taylor -- who both had close relationships with Curry -- repeatedly worked together to deliver drugs in North Dakota and then collect proceeds from mailed packages. See, e.g., United States v. Sparks, 949 F.2d 1023, 1027-28 (8th Cir. 1991) (defendants' presence in the same car on a journey to further the conspiracy indicates cooperation and agreement). Viewing this evidence in the light most favorable to the verdict, as we must, we conclude that there is sufficient evidence to uphold Dickson's conspiracy conviction.

## II. Sentencing Issue

Dickson argues the district court committed procedural sentencing error when it adopted the PSR and then varied upward based on findings that contradicted those in the PSR. We will reverse only if the court committed significant procedural error. United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). Procedural errors include improperly calculating the advisory guidelines range, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence. Id.

The jury found Dickson not guilty of conspiring to distribute 500 or more grams of methamphetamine but guilty of conspiring to distribute between 50 and 500 grams. To calculate the drug quantity for Dickson's base offense level, the PSR counted only the drugs found in the August 2016 intercepted package, 72.98 grams of heroin and 310.04 grams of methamphetamine. This produced a base offense level of 26. See USSG § 2D1.1. With no offense-level adjustments and Dickson's Category I criminal history, the advisory guidelines sentencing range would be 63 to 78 months imprisonment. The government's sentencing brief observed that "the drug quantity was likely higher," but the government did not object to the PSR drug quantity finding and guidelines range calculations. The government recommended a 78-month sentence.

Early in the sentencing hearing, the district court stated: "The Court will then adopt the Presentence Report as indicated, the sentencing guideline calculation as provided." Dickson requested a sentence between 60 to 63 months imprisonment, emphasizing he could not be "the major cog" in the conspiracy because the jury convicted him of conspiring to distribute only 50 to 500 grams of methamphetamine. The district court disagreed, sentencing Dickson to 120 months imprisonment. The court explained that the 18 U.S.C. § 3553(a) factors warranted a substantial upward variance:

He was an essential cog in the drug conspiracy. I listened carefully to the trial testimony . . . and I have concluded based upon a preponderance of the evidence that Mr. Dickson had a much larger role in this conspiracy than the charge reflects. Therefore, I believe that with regard to aggravating factors, approximately seven packages were sent to Zachariah Boelter, a codefendant from Bakersfield, between May of 2016 to August of 2016. In addition, 17 packages were sent from Bakersfield to an address in Dickinson . . . [and] there's also a record of one package from Bakersfield to David Hollingshead who was indicted in a separate conspiracy. . . . The punishment simply does not fit the crime and the nature and circumstances surrounding Mr. Dickson's active role and central role in this conspiracy.

Dickson objected, arguing as he does on appeal that he "should be given the opportunity to make additional comment and additional filings" because "[t]his is an unusual circumstance in which the Court has issued a sentence that is well above the guideline range without the request of the Government." On appeal, Dickson argues that the inherent contradictions between the PSR's advisory guidelines range and the district court's finding that Dickson was a driving force in the conspiracy mean that the court procedurally erred, either by fully adopting the PSR or by basing its sentencing decision on clearly erroneous facts.

We reject the assertion the district court committed error merely by finding that Dickson was more culpable than the jury's mixed verdict seemed to suggest. "[A]n acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." United States v. Ruelas-Carbajal, 933 F.3d 928, 930 (8th Cir. 2019) (quotation omitted). However, we agree the court procedurally erred because the fact findings underlying the variance imposed -- that Dickson was involved in transporting 25 packages from California to North Dakota, traveled to North Dakota on five occasions, collected drug debts, rented vehicles for Taylor, and was an "essential cog in the drug conspiracy" -- are inconsistent with court-adopted PSR

findings -- that Dickson was accountable for only one transaction and recommending no role-in-the-offense adjustment. See United States v. Brown, 453 F.3d 1024, 1026 (8th Cir. 2006); United States v. Portillo, 458 F.3d 828, 830 (8th Cir. 2006).

The PSR's findings may have been influenced by the jury's drug quantity verdict, which the district court was not obligated to follow if it found by a preponderance of the evidence that Dickson played a central role in the conspiracy and was responsible for conspiring to distribute drug quantities the jury found were not proven beyond a reasonable doubt. But the court should not have adopted the PSR findings if it intended to make contrary findings based on its first-hand knowledge of the trial evidence. The court could then have increased the drug quantity used to calculate Dickson's base offense level and applied an offense-level enhancement for his aggravating role in the offense. See, e.g., United States v. Gregg, 467 F.3d 1126, 1129 (8th Cir. 2006). In addition, because the government did not object to the PSR's guideline range calculations, the court should have alerted counsel before the hearing that it was considering an upward variance based on trial evidence that Dickson was an "essential cog" in the conspiracy, or at least given defense counsel an opportunity to be heard when the court explained that it was varying upward based on transactions the PSR did not attribute to Dickson and on his aggravated role in the conspiracy. See USSG § 6A1.3(a); United States v. Wiley, 509 F.3d 474, 479 (8th Cir. 2007).

On the record before us, we cannot conclude that the inconsistencies between the PSR findings and the findings on which the district court based its upward variance, combined with the lack of prior notice, resulted in procedural sentencing error that was harmless. See, e.g., United States v. Williams, 627 F.3d 324, 329 (8th Cir. 2010). Indeed, the government does not argue that any procedural sentencing

error was harmless.  Accordingly, we affirm Dickson's conviction, vacate the Judgment in a Criminal Case, and remand for resentencing.[1]

_____

---

[1]Because we are remanding for resentencing, we do not reach Dickson's argument that the district court erred when it justified a longer sentence for Dickson than for Boelter and Taylor because both conspirators cooperated with the government, when only Boelter cooperated.