# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1293

_____

United States of America,                         *
                                                  *
                    Appellee,                      *
                                                  *        Appeal from the United States
        v.                                        *        District Court for the
                                                  *        Northern District of Iowa.
Ann Victoria Ellefson,                            *
                                                  *
                    Appellant.                     *


_____

Submitted: October 19, 2004
Filed: August 23, 2005

_____

Before COLLOTON, LAY, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

        Ann Victoria Ellefson was convicted of distributing and aiding and abetting the distribution of 2,887 pseudoephedrine pills knowing, or having a reasonable cause to believe, the pseudoephedrine would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2) and 18 U.S.C. § 2 (Count 1); possession with intent to distribute and aiding and abetting possession with intent to distribute 260.5 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2 (Count 2); and possession of methamphetamine and marijuana, in violation of 21

U.S.C. § 844(a) (Count 3).  The district court[1] sentenced Ellefson to 188 months' imprisonment pursuant to U.S. Sentencing Guidelines Manual §§ 2D1.1 and 2D1.11. Ellefson appeals her conviction as to Counts 1 and 2, claiming that there was insufficient evidence to support the jury verdicts.  She also appeals her sentence, claiming that the lack of a "mitigating-role cap" in U.S.S.G. § 2D1.11 violated her rights to due process and equal protection, and that she should be resentenced under advisory guidelines.  We affirm.

## I.    BACKGROUND

Ellefson's convictions arose from her involvement with the drug-related activities of her then boyfriend, Ryan Buchheim.  The case against Ellefson centered around a September, 2002, transfer of 2,887 pseudoephedrine pills from Ellefson and Buchheim to undercover police officer Josh Lupkes and confidential informant Flint Hillman in exchange for two tanks purportedly containing anhydrous ammonia.

Lupkes and Hillman met Buchheim and Ellefson outside of her residence in Cedar Rapids, Iowa.  With Ellefson present, Hillman helped Buchheim move the purported anhydrous ammonia tanks from his car into Buchheim's van.  Hillman, Buchheim and Ellefson then went into her apartment, leaving Lupkes in Hillman's car.  Inside her apartment, Ellefson quizzed Hillman about how well he knew Lupkes. Ellefson asked Hillman: "Why are you afraid to bring him up?"; "How long have you known him?"; "Does he know what you're coming here for?"; "Then it doesn't really matter, does it?"  Hillman told Ellefson that Lupkes was "where I got all my crank from" and that Lupkes knew why Hillman was in her apartment.

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

While Hillman was in Ellefson's apartment, Buchheim spoke on the telephone with his pseudoephedrine supplier to set up a delivery of pseudoephedrine. As soon as Buchheim hung up the phone, Ellefson asked him "Do you know when?" and "Who? When? Where?" Buchheim replied, "At my place, about half an hour and a case. It's like 8,640 pills." Ellefson then asked to use Buchheim's van to run an errand. Buchheim noted that the purported anhydrous ammonia tanks were in the back and stated, "See, unless you want to take them and drop them off at [his storage garage] . . . ." Ellefson responded, "You want me to?" and Buchheim replied, "Actually, I kinda want to go with you, if you go." Ellefson replied, "Okay," but Buchheim ultimately decided to drive because Ellefson might "take a wrong turn or something."

Still inside Ellefson's apartment, Ellefson and Buchheim agreed to meet Hillman later that day at Buchheim's apartment to deliver the pseudoephedrine. Buchheim kept his pseudoephedrine in a garage he rented for storage. Aware of the reason for their trip, Ellefson rode with Buchheim to the garage in which Buchheim kept a safe containing cocaine, pseudoephedrine, a triple-beam scale, numerous glass pipes and other items related to the production of methamphetamine, such as starter fluid, rubber tubing and empty tanks for storing anhydrous ammonia. Buchheim placed the anhydrous ammonia tanks in the garage and retrieved pseudoephedrine and cocaine to give to Hillman.

After retrieving the pseudoephedrine, Ellefson and Buchheim met Hillman at Buchheim's apartment. Upon arrival, both Ellefson and Buchheim described two surveillance vehicles that followed them from the garage. Ellefson stated that one of the vehicles following them was a blue or black Dodge. Before leaving Buchheim's apartment, Hillman received 2,887 pseudoephedrine tablets (60mg each) and some cocaine.

On December 2, 2002, Police executed an arrest warrant on Buchheim at Ellefson's residence. When Buchheim was arrested, he informed officers that he lived at Ellefson's apartment. Police allowed Ellefson to leave while they secured the apartment and applied for a search warrant. Before leaving, Ellefson removed $3,500 of drug proceeds from Buchheim's duffle bag and tried to hide the money in the waistband of her jeans. An officer stopped Ellefson and removed the money from her waistband. The officer asked Ellefson whether there was anything else in the bag he needed to know about. Ellefson replied, "Drugs."

While executing the search warrant, police found a large vacuum-sealed bag of cocaine, smaller amounts of cocaine, methamphetamine and marijuana in Buchheim's duffle bag. Police also found numerous drug-related materials scattered and readily accessible throughout Ellefson's apartment, including a small scale, an electronic scale, a box of small sandwich bags, a partially burnt marijuana cigarette, rolling papers, several marijuana "bongs," torches and glass pipes used to ingest methamphetamine, and methamphetamine.

An investigating officer testified that Buchheim told police that his source delivered large amounts of pseudoephedrine to Ellefson's apartment and that Ellefson was present when he repackaged the pills. Buchheim testified that he packed the drugs found in his duffle bag for a recent weekend stay at a hotel, where he and Ellefson consumed drugs from the bag. Buchheim testified that he sometimes stayed at Ellefson's apartment and that she knew he was selling pseudoephedrine, marijuana, cocaine and methamphetamine from her apartment.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

Ellefson argues that there was insufficient evidence to convict her of aiding and abetting the distribution of pseudoephedrine with intent to manufacture methamphetamine (Count 1) and aiding and abetting possession with intent to distribute cocaine (Count 2).[2]  Ellefson contends that, at most, the evidence demonstrated that she knew of Buchheim's activities but did not participate in those activities as required to sustain an aiding and abetting conviction.  We disagree.

When reviewing the sufficiency of evidence to support a jury verdict, this Court "views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict."  *United States v. Espino*, 317 F.3d 788, 791 (8th Cir. 2003).  This standard of review is very strict, and a jury verdict will not be overturned lightly.  *United States v. Crossland*, 301 F.3d 907, 913 (8th Cir. 2002).  We may reverse a jury's verdict only if "no reasonable jury could have found the accused guilty beyond a reasonable doubt."  *United States v. Collins*, 340 F.3d 672, 678 (8th Cir. 2003).  A jury verdict may be based on circumstantial as well as direct evidence, and "[t]he evidence need not exclude every reasonable hypothesis except guilt."  *United States v. Williford*, 309 F.3d 507, 509 (8th Cir. 2002) (quoting *United States v. Erdman*, 953 F.3d 387, 389 (8th Cir. 1992)) (internal quotations omitted).

There are three elements for aiding and abetting distribution of controlled substances: "(1) the defendant associated herself with the unlawful venture; (2) the

---

[2]Ellefson does not challenge the sufficiency of the evidence to support the jury's verdict on Count 3 regarding possession of methamphetamine and marijuana.

defendant participated in it as something she wished to bring about; and (3) the defendant sought by her actions to make it succeed." *United States v. Mitchell*, 388 F.3d 1139, 1143-44 (8th Cir. 2004); *United States v. Rojas*, 356 F.3d 876, 878 (8th Cir. 2004). This Court has acknowledged that "[m]ere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting." *Snyder v. United States*, 448 F.2d 716, 718 (8th Cir. 1971) (citations omitted). Nonetheless, "[j]urors can be assumed to know that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences." *United States v. Baker*, 98 F.3d 330, 338 (8th Cir. 1996) (quoting *United States v. Ortiz*, 966 F.2d 707, 712 (1st Cir. 1992)) (internal quotations omitted).

Viewed in the light most favorable to the verdict, there was sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Ellefson aided and abetted both the distribution of pseudoephedrine and possession with intent to distribute cocaine. That Ellefson associated herself with Buchheim's unlawful activities is undeniable, and the prosecution presented ample evidence that Ellefson both participated in those activities and sought by her actions to make them succeed.

With regard to the distribution of pseudoephedrine, the jury heard testimony that Ellefson allowed Buchheim to receive and package large amounts of pseudoephedrine in her apartment. The jury also learned that Ellefson believed the tanks contained anhydrous ammonia to be used in the manufacture of methamphetamine and that she not only allowed the tanks to be exchanged outside of her apartment but also that she invited Hillman into her apartment to discuss when and where they would complete the transaction. *See Rojas*, 356 F.3d at 879 (holding that there was sufficient evidence for aiding and abetting where the jury could reasonably conclude that the defendant "knew that drugs were being sold and that he intentionally provided his apartment as a location for their sale").

Moreover, the jury heard a recording on which Ellefson grilled Hillman about the extent of the knowledge of the undercover officer in his car and testimony that she described the vehicles that she understood to be police surveillance following her when she accompanied Buchheim to retrieve the pseudoephedrine. This evidence demonstrated that she understood the illegal nature of the activity and sought to protect the operation. In addition, the jury learned that Ellefson offered to transfer the purported anhydrous ammonia tanks to Buchheim's storage locker, which provided further evidence of her willingness to participate. Based on this evidence, a reasonable jury could have found that Ellefson wished to bring about this transfer of pseudoephedrine and acted to make it succeed.

The jury also could have reasonably found that she aided and abetted possession with intent to distribute the large amount of cocaine that she knew was stored in her bedroom. The police search of Ellefson's apartment produced substantial evidence from which a jury could have reasonably inferred Ellefson's intent to participate in Buchheim's illegal drug distribution. This evidence included large quantities of assorted controlled substances and drug paraphernalia, including a vacuum-sealed bag containing 260.5 grams of cocaine, two scales for weighing controlled substances and a large amount of money stored with controlled substances. *See United States v. Brett*, 872 F.2d 1365, 1370 (8th Cir. 1989) (holding that intent to distribute "may be inferred solely from the possession of large quantities of drugs"); *United States v. LaGuardia*, 774 F.2d 317, 319 (8th Cir. 1985) ("The presence of equipment to weigh and measure cocaine may be viewed as evidence of intent to distribute."); *United States v. Johnson*, 977 F.2d 457, 458 (8th Cir. 1992) ("[I]ntent to distribute 'may be inferred from circumstantial evidence such as a large sum of cash, and a quantity of a controlled substance.'") (quoting *United States v. Knox*, 888 F.2d 585, 588 (8th Cir. 1989)).

Ellefson also argues that because Buchheim had already been arrested when he asked her to remove the money from his duffle bag before police could seize it, she

could only be found guilty as an accessory after the fact. *See United States v. Delpit*, 94 F.3d 1134, 1150 (8th Cir. 1996) (holding that co-conspirator whose role began after the crime was completed could only be an accessory after the fact). This argument fails as there was more than sufficient evidence presented at trial, including Buchheim's testimony that Ellefson used drugs stored in his bag during a recent weekend trip, that Ellefson knew the drugs were in his bag in the bedroom of her apartment. *United States v. McCracken*, 110 F.3d 535, 541 (8th Cir. 1997) (holding that a person has constructive possession if she has "dominion over the premises in which the contraband is concealed"); *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002) (noting that "*knowledge* of presence, combined with *control* over the thing is constructive possession") (internal quotations omitted).

Viewing the evidence in the light most favorable to the government, we hold that there was sufficient evidence for a reasonable jury to find Ellefson guilty beyond a reasonable doubt of aiding and abetting the distribution of pseudoephedrine and aiding and abetting possession with intent to distribute cocaine. Therefore, we affirm her convictions on Count 1 and Count 2.

## B. Sentencing

Ellefson also appeals her sentence on two grounds: first, that the district court's failure to apply the "mitigating-role cap" of U.S.S.G. § 2D1.1 to her sentence under Count 1 violated her constitutional rights to due process and equal protection of the law under the Fifth Amendment of the U.S. Constitution, and second, that the district court committed plain error by sentencing her under advisory guidelines. We reject both of these arguments and affirm Ellefson's sentence.

The district court determined Ellefson's sentence for her convictions on Counts 1 and 2 utilizing U.S.S.G. § 2D1.11 and U.S.S.G. § 2D1.1. The district court applied § 2D1.11 to her conviction on Count 1 because that section covers convictions

involving methamphetamine and amphetamine precursor chemicals, including pseudoephedrine. The district court applied 2D1.1 to Ellefson's conviction on Count 2 because that conviction involved possession with intent to distribute an actual controlled substance, which in this case was cocaine. Section 2D1.1 caps the offense level at 30 for any person, such as Ellefson, who receives a two-level "minor-role" adjustment under § 3B1.2. U.S.S.G. § 2D1.1(a)(3). Unlike § 2D1.1, § 2D1.11 does not have a similar mitigating-role cap.

Applying § 2D1.1 to Count 2, the district court found Ellefson responsible for 260.5 grams of cocaine and relevant conduct involving 2,494.32 grams of pseudoephedrine. These drug quantities would have produced a base offense level of 36, but Ellefson's base offense level was capped at 30 under the mitigating-role cap of § 2D1.1(a)(3). The district court also subtracted two levels for a § 3B1.2 minor-role adjustment, giving Ellefson a total offense level of 28 for Count 2. Applying § 2D1.11 to Count 1, the district court found Ellefson's relevant conduct involved the same 2,494.32 grams of pseudoephedrine, which also produced a base offense level of 36. Because § 2D1.11 does not have a mitigating-role cap, Ellefson's base offense level for Count 1 remained 36. The district court likewise subtracted two offense levels for a minor-role adjustment pursuant to § 3B1.2, which gave Ellefson an offense level of 34 for Count 1.

Because Count 1 and Count 2 were closely related counts, the grouping rules of § 3D1.2 and § 3D1.3 required the district court to use the higher of the two base offense levels to calculate Ellefson's sentence. U.S.S.G. §§ 3D1.2(d) and 3D1.3(b). Ellefson's final offense level of 34 combined with her criminal history category of III to produce a sentencing range of 188-235 months. The district court sentenced Ellefson to concurrent 188-month sentences for both Count 1 and Count 2.[3]

---

[3]The district court also sentenced Ellefson to 24 concurrent months' imprisonment for her conviction on Count 3, but Ellefson does not appeal that part

We review a sentencing court's interpretation and application of the guidelines de novo. *United States v. Mashek*, 406 F.3d 1012, 1017 (8th Cir. 2005) (holding that *United States v. Booker*, 125 S. Ct. 738 (2005), did not affect this Court's de novo standard of review for the interpretation and application of the sentencing guidelines). "'When construing the Guidelines, we look first to the plain language, and where that is unambiguous we need look no further.'" *United States v. Ashley*, 342 F.3d 850, 852 (8th Cir. 2003) (quoting *United States v. Andreas*, 216 F.3d 645, 676 (7th Cir. 2000)). We review constitutional challenges to the guidelines de novo. *United States v. Martinez*, 339 F.3d 759, 761 (8th Cir. 2003).

First, Ellefson contends that Amendment 640 to the sentencing guidelines, which enacted the mitigating-role cap for offenses involving actual controlled substances but not for offenses involving methamphetamine precursors, amounts to a denial of substantive due process and equal protection of the law under the Fifth Amendment. Ellefson does not argue that Amendment 640 discriminated against a protected class or affected a fundamental right. Thus, under both due process and equal protection, Ellefson bears the burden of proving that the unavailability of the mitigating-role cap for sentences calculated under § 2D1.11 is not rationally related to a legitimate governmental purpose. *See United States v. Buckner*, 894 F.2d 975, 978 (8th Cir. 1990) (rejecting due process challenge to the guidelines because "[a]cts do not offend principles of substantive due process if they bear a reasonable relation to a proper legislative purpose, and are neither arbitrary or discriminatory") (internal quotations omitted); *United States v. House*, 939 F.2d 659, 664 (8th Cir. 1991) (rejecting equal protection challenge to the guidelines because when a statute does not discriminate on the basis of race or affect a fundamental right, "the distinction between penalties need only be rationally related to a legitimate governmental objective"). Ellefson contends that there is no rational basis for imposing a harsher

---

of her sentence.

-10-

sentence on the possession of precursor chemicals such as pseudoephedrine than on the possession of the actual controlled substance.

It is unclear whether amendments to the sentencing guidelines are subject to a substantive due process challenge. *See United States v. Fortney*, 357 F.3d 818, 821 (8th Cir. 2004). Assuming without deciding that they are, Ellefson fails to meet her burden of proof under either due process or equal protection.

Ellefson argues that Amendment 640 lacked a rational basis because the Sentencing Commission did not find that offenses involving precursor chemicals are more harmful than offenses involving the final product. Courts, however, do not require the Sentencing Commission to provide reasons for its actions. *See United States v. Anton*, 380 F.3d 333, 336 (8th Cir. 2004) ("Although § 2D1.1 expressly provides for a possible two-level reduction, the plain language of the applicable Guideline section – § 2D1.11 – makes no mention of the two level safety valve reduction. We will not presume the Sentencing Commission intended otherwise."). In addition, there is nothing patently irrational about sentencing similar, but distinct, offenses differently. *See Buckner*, 894 F.2d at 978-79 (holding that the "100 to 1" sentencing ratio for cocaine to cocaine base is not irrational and does not violate due process); *House*, 939 F.2d at 664 (holding that the "100 to 1" ratio is not irrational and does not violate equal protection). This Court has recognized that the Sentencing Commission did not intend § 2D1.1 and § 2D1.11 to produce identical results in all circumstances. *See United States v. Frazier*, No. 04-1005, slip op. at 14 (8th Cir. May 31, 2005) (holding that the district court properly refused to apply a mitigating-role cap to a sentence calculated under § 2D1.1); *Anton*, 380 F.3d at 335-36 (holding that under the plain language of the guidelines, the "safety-valve reduction" of § 2D1.1 does not apply to sentences calculated under § 2D1.11). Because she failed to prove more than the disparate impact on her sentence, Ellefson fails to carry her

burden of proving an irrational basis necessary to prevail on her due process and equal protection arguments.[4]

Second, in supplemental briefs Ellefson challenges the district court's mandatory application of the sentencing guidelines under *United States v. Booker*. Because Ellefson failed to argue *Apprendi* or *Blakely* error or that the guidelines were unconstitutional before the district court, we review for plain error. *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc).

We evaluate plain error under the four-part test of *United States v. Olano*, 507 U.S. 725, 732-36 (1993), as stated in *Johnson v. United States*, 520 U.S. 461, 466-67 (1997):

---

[4]Amendment 668 to the sentencing guidelines, which took effect on November 1, 2004, eliminated this disparity between § 2D1.1 and § 2D1.11 by eliminating the mitigating-role cap of § 2D1.1(a)(3), and inserting in both § 2D1.1 and § 2D1.11 a sliding scale, in which increased sentence-level reductions correspond to increased base offense levels. *See* U.S.S.G. §§ 2D1.1(a)(3), 2D1.11(a) (2004). Although Amendment 668 does not apply to Ellefson, who was properly sentenced under the guidelines in effect at the time of her sentencing, the amendment removes this divergence for future cases.

In any event, we do not find the differences between § 2D1.1 and § 2D1.11 that were applicable to Ellefson to be without rational justification. For example, both Congress and the courts have recognized that the manufacture of methamphetamine is an inherently dangerous activity that creates substantial risks to public health and safety. *See, e.g.*, *Fortney*, 357 F.3d at 821 n.5 ("Congress found that methamphetamine manufacturing 'poses serious dangers to both human life and to the environment,' and that the manufacturing process is 'unstable, volatile, and highly combustible.'"); *United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002) (noting that the "potential hazards of methamphetamine manufacture are well documented").

[B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

Following *Pirani*, Ellefson has established the first two parts of the *Olano* test. *See Pirani*, 406 F.3d at 550 ("The district court (understandably) committed *Booker* error by applying the Guidelines as mandatory, and the error is plain, that is, clear or obvious, at this time."). To establish the third part, Ellefson bears the burden of demonstrating "a reasonable probability that [she] would have received a more favorable sentence with the *Booker* error eliminated by making the Guidelines advisory." *Id.* at 551.

Ellefson cannot establish a reasonable probability that the district court would have imposed a more favorable sentence under advisory guidelines. The district court stated that in determining where to sentence Ellefson within the applicable guidelines range, it considered the nature and circumstances of Ellefson's offense as well as her history and character and imposed a sentence "to afford adequate deterrence to criminal conduct and protect the public." In addition, that Ellefson was sentenced at the bottom of the applicable guidelines range "is insufficient, without more, to demonstrate a reasonable probability that the court would have imposed a lesser sentence absent the *Booker* error." *Pirani*, 406 F.3d at 553. After a careful review of the record, we find no evidence indicating that the district court would have imposed a lesser sentence under advisory guidelines. The arguments Ellefson makes regarding the probability of receiving a lesser sentence on remand are based only on speculation about the effect of *Booker* error on her sentence, and, therefore, she "'has not met [her] burden of showing a reasonable probability that the result would have been different but for the error.'" *Id.* at 553 (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1301 (11th Cir. 2005)).

## III. CONCLUSION

For the reasons set forth above, we affirm both Ellefson's convictions and her sentence.

LAY, Circuit Judge, concurring.

Ann Ellefson was addicted to drugs. During her addiction, she allowed her boyfriend to use her apartment as a storage and distribution center for his business in illegal narcotics. The evidence showed that she was aware of his activities, accompanied him on a delivery of illegal materials, and independently offered to aid him in carrying out his business. Under these circumstances, the jury reasonably found her guilty of aiding and abetting the sale of illegal narcotics. Yet I wonder the extent to which her drug addiction contributed to her crimes and I find myself doubting whether the interests of society – let alone those of Ellefson – are served by her 188-month sentence (almost sixteen years in prison). To the extent that her addiction caused her actions, a sentence addressing her underlying addiction would better serve the interests of society.

Unfortunately, our inflexible federal criminal justice policy responds to the epidemic of drug crimes without adequately providing federal judges with the ability to address drug addiction – the root cause of this epidemic. In contrast, many states have created specialized drug courts that approach this epidemic with much greater success. In most drug courts, nonviolent, substance-abusing offenders charged with drug-related crimes are channeled into judicially supervised substance abuse treatment, mandatory drugs testing, and other rehabilitative services in an effort to reduce recidivism. Eligible offenders typically have the charges against them stayed and dropped if treatment is successful, or plead guilty with prosecution deferred and criminal punishment withheld if treatment is successful. Evidence shows that the flexible and pro-active approach of drug courts reduces recidivism rates to less than

half of the recidivism rate of those offenders who are simply imprisoned for their drug crimes. Unfortunately, the federal criminal justice system offers no such alternatives for nonviolent, substance-abusing offenders. Given the tremendous economic and human costs of imprisoning nonviolent drug offenders, Congress should seriously consider creating federal drug courts. Federal drug courts would save a significant amount of money for taxpayers.

_____