# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1448
_____

United States of America

*Plaintiff - Appellee*

v.

Fidel Sanchez

*Defendant - Appellant*

_____

No. 14-2009
_____

United States of America

*Plaintiff - Appellee*

v.

Julian Marin Gutierrez, also known as Trinidad Pineda

*Defendant - Appellant*

_____

No. 14-2011
_____

United States of America

*Plaintiff - Appellee*

v.

Jose Sanchez Adame

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: February 12, 2015
Filed: June 15, 2015

_____

Before BYE, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

A jury found Jose Sanchez Adame (Adame), Julian Marin Gutierrez and Fidel Sanchez guilty of conspiracy to distribute methamphetamine and also convicted Adame and Sanchez of distributing methamphetamine.[1] The defendants challenge the sufficiency of the evidence supporting their convictions. Sanchez also appeals the district court's[2] admission of certain evidence and claims he received ineffective assistance of counsel. We affirm.

_____

[1]The jury also found Gutierrez guilty of conspiracy to commit money laundering, money laundering, and structuring transactions to evade reporting requirements. He does not challenge the jury's verdict with respect to these charges.

[2]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

## I. BACKGROUND

The charges against the defendants arose from an extensive law enforcement investigation of the distribution of methamphetamine in and around Marshalltown, Iowa. The investigation spanned from the fall of 2010 through late 2012 and utilized, inter alia, confidential informants (CIs), police surveillance, and numerous controlled buys that were recorded. As a result of this investigation, a superseding indictment was filed charging Adame, Sanchez, Gutierrez and others with conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine and 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a), (b)(1)(A), and 846. Count 5 of the indictment charged Adame with one count of distribution of 50 grams or more of methamphetamine, in violation of §§ 841(a)(1) and (b)(1)(A), and counts 24 through 28 each charged Sanchez with distribution of 5 grams or more of methamphetamine, in violation of §§ 841(a)(1) and (b)(1)(B). Several of the alleged co-conspirators pleaded guilty to various charges in the indictment, but Adame, Sanchez and Gutierrez asserted their innocence and proceeded to trial.

At trial, the government presented substantial evidence regarding the role each defendant played in the alleged conspiracy. A special agent with the United States Drug Enforcement Administration (DEA) testified that the DEA and the Mid-Iowa Drug Task Force began investigating Adame in the fall of 2010 after an individual whom they had arrested while in possession of a large amount of methamphetamine identified Adame as her source. The investigation quickly expanded to include other individuals believed to be part of a methamphetamine distribution ring in the Marshalltown area. The government presented testimony from numerous cooperating witnesses who discussed the prominent role Adame played in the distribution ring. These witnesses described a pattern in which Adame and his brother, Jose Luis Sanchez Adame (Luis) regularly fronted them distribution-quantities of

methamphetamine, typically ranging from one to eight ounces.[3] The individuals then sold the drugs and provided payment to Adame and Luis. The government provided corroborating evidence in support of these witnesses's testimonies, including filmed footage of numerous controlled buys and drugs obtained during these buys, drugs and cash seized during searches of several witnesses's vehicles or homes, and audio recordings of telephone calls in which Adame and Luis discussed distribution of methamphetamine and collection of proceeds from drug sales. The government also presented evidence that Adame and other high-level dealers supplied methamphetamine to each other, particularly when one of the dealers was unable to obtain drugs from his or her regular sources. One witness testified that these dealers "constantly" relied on each other for methamphetamine, and he explained "that's how Marshalltown works." Another witness testified that the Marshalltown drug community is small, and the witness agreed that "everybody's in everybody else's business."

The government also presented evidence that on at least one occasion Adame personally distributed methamphetamine. On May 4, 2011, officers set up a controlled buy between Adame and a customer who cooperated with law enforcement. The customer met with Adame and gave him $2,000 as partial payment for three ounces of methamphetamine. Later that day, the customer met with one of Adame's associates, Antonio Cebrero Mendiola, who collected the remainder of the payment and delivered the methamphetamine. Adame's role in this sale provided the basis for the distribution charge alleged against him in count 5 of the indictment.

---

[3]Multiple witnesses testified that a user-type quantity of methamphetamine ranges from a quarter of a gram to two grams, depending on the "quality" of the drugs. See United States v. Slagg, 651 F.3d 832, 847 (8th Cir. 2011) (noting DEA agent's testimony that a typical dosage amount of methamphetamine is less than one gram); United States v. Pruett, 501 F.3d 976, 985 (8th Cir. 2007) (stating that "one ounce equals approximately 28.35 grams" and holding that "[i]t was reasonable for the jury to infer that the [one ounce quantities of drugs were] purchased for resale.").

At trial, a substantial portion of the government's evidence centered around Mendiola's[4] and Gutierrez's distribution activities in 2012. Mendiola began working for Adame in or about 2009, and his role primarily involved collecting money and delivering methamphetamine to Adame's customers. In December 2011, Mendiola and Adame supposedly had a "falling out" over money. Shortly thereafter, Mendiola started collaborating with Gutierrez and Kyla Forbes to buy, process and sell methamphetamine. Gutierrez obtained methamphetamine for Mendiola through a variety of channels, and they used Forbes's garage to process and store the drugs.[5] Mendiola also kept methamphetamine in a storage unit. Mendiola, Gutierrez and others maintained several bank accounts into which they deposited proceeds from methamphetamine sales.

The government presented evidence that Adame and Mendiola facilitated one another's distribution activities even after their supposed falling out. On March 15, 2012, officers intercepted a phone call between Luis and Adame in which Luis indicated that he hoped to receive $20,000 in drug proceeds by the following day. That same evening, officers observed a silver Ford Edge arrive at Luis's home and then travel to a motel. The next day, officers observed the Ford Edge travel to Mendiola's house, Luis's house, and multiple locations where Mendiola and Gutierrez stored methamphetamine, including Forbes's garage and Mendiola's storage unit. On March 18, 2012, officers stopped the vehicle and in a subsequent search discovered $134,690 in cash hidden in the bumper and packaged in black electrical tape, which was consistent with the manner in which Mendiola and Gutierrez packaged drug

[4]The superseding indictment charged Mendiola with conspiracy to distribute methamphetamine, distribution of methamphetamine, and two counts of possession with intent to distribute methamphetamine. Mendiola pleaded guilty to the conspiracy count, and the government agreed to drop the other charges against him.

[5]One cooperating witness stated that Mendiola and Gutierrez typically stored several pounds of methamphetamine in Forbes's garage at any given time.

proceeds. In addition, a witness testified that in the fall of 2012, Gutierrez told her that Adame owed him $30,000 for methamphetamine. There is also some evidence that as late as October 2012 Forbes obtained distribution-quantities of methamphetamine from Raymundo Calderon, who delivered drugs and collected money for Adame. Finally, a cooperating witness testified that he engaged in a methamphetamine transaction in which Adame and Gutierrez jointly sold him five or six ounces of methamphetamine. The witness further indicated that he saw Gutierrez at Adame's house "on different occasions."

The government also offered substantial evidence regarding Sanchez's role in the alleged conspiracy. Several witnesses testified that Sanchez worked primarily as a driver for Calderon while he delivered methamphetamine and collected money for Adame. In addition, witnesses testified that they observed Sanchez either package or distribute methamphetamine. The government also presented audio and video footage and other evidence of five controlled buys during which Sanchez and Calderon allegedly sold methamphetamine to a CI. Each of the controlled buys took place in the CI's home. Sanchez's arguments on appeal stem primarily from the district court's admission of evidence related to these controlled buys.

The first controlled buy took place on July 19, 2012 ("July 19th Buy"). The government's footage of the buy depicts the CI handing a stack of money to Sanchez, and Sanchez appears to count the money several times. Calderon then hands something to the CI, and the CI asks "is this one?" Either Calderon or Sanchez replies, "no, two." After the buy, officers recovered two ounces of methamphetamine from the CI, and these drugs were admitted as an exhibit at trial. Sanchez did not object to any of the government's evidence related to the July 19th Buy.

The second controlled buy occurred on July 27, 2012 ("July 27th Buy"). The footage of the buy depicts two men entering the CI's home. However, the footage is somewhat blurry and the angle of the camera makes it difficult to identify the two

men. The DEA agent involved testified that, based on the surveillance law enforcement had outside of the CI's home, he could "definitively" say that the two men were Sanchez and Calderon. Sanchez's counsel objected to this testimony on the grounds that the video was barely clear and that it was the jury's role to determine who was portrayed in the footage. The district court overruled this objection. The video appears to depict the CI and Calderon discussing the price of the methamphetamine and a drug debt the CI owed. The CI then hands money to Calderon, and Sanchez in turn hands something to the CI. After the buy, the CI turned over a clear baggie that contained methamphetamine. At trial, the government introduced these drugs as Exhibit 2.14. Sanchez objected to the admission of Exhibit 2.14 on the grounds that the coloring of the drugs (off-white amber hue) did not match the description the agent provided in his DEA-6 report (off-white with red flecks). Sanchez did not, however, make a chain-of-custody objection. The district court overruled Sanchez's objection and admitted Exhibit 2.14 into evidence. The third and fourth controlled buys took place, respectively, on August 2 and August 6 of 2012. The footage of these buys indicates they were similar in nature to the first two buys, and Sanchez did not object to any of the evidence related to them.

The fifth controlled buy occurred on August 13, 2012 ("August 13th Buy"). At trial, the government played a phone call the CI placed to arrange the buy. During the call, the CI stated that he was home and that he wanted "one." Over Sanchez's objection, the DEA agent testified that the CI's reference to "one" meant that he wanted one ounce of methamphetamine. The agent had also previously indicated that he understood the meaning of specific terms the CI used because he and his agents instructed the CI regarding the type, quantity and price of the drugs he was to purchase. The government then played two video clips that depicted two separate meetings the CI had with Calderon and Sanchez on the day of the buy. The audio from the first clip is somewhat unintelligible, and the agent testified that, based on his recollection of the events surrounding the buy, no transaction occurred during the first meeting because Calderon and Sanchez did not have any methamphetamine with

them. Sanchez made a confrontation clause objection on the grounds that the participants depicted in the video were the proper persons to testify as to what happened during the first meeting. The district court overruled this objection. The government subsequently introduced, without objection, the second clip, which appears to depict a methamphetamine purchase by the CI from Calderon and Sanchez.

The jury ultimately found each defendant guilty on all counts charged. Adame and Gutierrez timely filed post-trial motions for, in relevant part, judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."). Both defendants claimed the evidence proved the existence of two conspiracies, thereby creating a variance between the indictment and the proof. In denying Adame's and Gutierrez's motions, the district court determined that a reasonable jury could have concluded the government's evidence proved a single conspiracy to distribute methamphetamine. Sanchez did not file any post-trial motions challenging the sufficiency of the evidence.

## II.    DISCUSSION

### A.    Adame and Gutierrez

On appeal, Adame and Gutierrez contend the district court erred in denying their motions for judgment of acquittal because there was insufficient evidence to support their convictions. "We review such a denial de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Slagg, 651 F.3d 832, 839 (8th Cir. 2011) (internal quotation omitted). "We will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (internal quotation omitted).

## 1. Single Conspiracy v. Multiple Conspiracies

"To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." Id. at 840 (quotation omitted). "An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case." Id. (quotation omitted). On appeal, neither Adame nor Gutierrez seriously contends that the government failed to sufficiently prove that they each conspired with others to distribute over 500 grams of methamphetamine in the Marshalltown area. They instead argue that, although the indictment charges a single conspiracy, the government's evidence conclusively proved the existence of two separate conspiracies, thereby creating a variance.

"A variance between an indictment and the [g]overnment's proof at trial occurs if the [g]overnment proves multiple conspiracies under an indictment alleging only a single conspiracy." United States v. McCauley, 715 F.3d 1119, 1124 (8th Cir. 2013) (quotation omitted). "Whether trial evidence established a single conspiracy is determined by the totality of the circumstances, including consideration of the nature and location of activities and events, identities of the co-conspirators, and the time frame in which the acts occurred." Id. at 1123 (internal quotation omitted). This is a factual determination which we review for clear error, viewing the evidence in the light most favorable to the jury's verdict. United States v. Benford, 360 F.3d 913, 914 (8th Cir. 2004). "If a variance is established, reversal is warranted only if the variance infringed a defendant's substantial rights." Slagg, 651 F.3d at 842 (internal quotation omitted). Adame and Gutierrez assert that Mendiola, Gutierrez and Forbes formed their own separate distribution conspiracy after Mendiola supposedly defected from Adame's operation. Adame and Gutierrez further contend that the government's evidence shows, at most, that members of their operation engaged in individual buy-

sell deals during 2012 but that there was no "concrete, interlocked interest" between the organizations.

Having closely reviewed the record, we conclude that "a reasonable jury could infer a single conspiracy from the totality of the circumstances presented at trial." Id. Although Gutierrez and Mendiola apparently engaged in some independent distribution activities and competed with Adame's operation, these factors do not conclusively prove the existence of two conspiracies. Id. (holding that a single "conspiracy may exist despite the involvement of multiple groups and the performance of separate acts [and that dealers] who compete with one another may be members of the same conspiracy." (internal quotations omitted)). Here, the record establishes that Adame, Gutierrez and Mendiola engaged in the same activity (large-scale distribution of methamphetamine) in the same area (Marshalltown) during the time frame alleged in the indictment. Id. Further the government presented evidence that high-level members of Adame's and Gutierrez's groups made numerous distribution-quantity sales of methamphetamine to or with one another. This evidence suggests substantial interdependence and facilitative cooperation between the two groups and amply supports a finding that the members of both groups "were engaged in a tacit agreement to distribute [drugs] on an ongoing basis and thus were engaged in a common enterprise." Id. at 841 (internal quotation omitted); see United States v. Garcia-Hernandez, 530 F.3d 657, 661 (8th Cir. 2008) ("[E]vidence of multiple sales of resale quantities of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute." (quotation omitted)); United States v. Donnell, 596 F.3d 913, 925 (8th Cir. 2010) (holding that "evidence is sufficient to support a conspiracy where the drugs were purchased for resale" because a reasonable jury could find that the participants "shared a conspiratorial purpose to advance other transfers" (quotations omitted)). Accordingly, we are not persuaded that the government's evidence supported only a finding of multiple conspiracies.

-10-

However, even if a variance occurred, Adame and Gutierrez have failed to establish that the variance infringed upon their substantial rights. "Substantial rights are affected when a defendant is prejudiced by a spillover of evidence from one conspiracy to another or could not reasonably have anticipated from the indictment the evidence to be presented against him." McCauley, 715 F.3d at 1125 (internal quotations omitted). Adame and Gutierrez both argue that they were prejudiced by spillover evidence from one another's separate conspiracies. Assuming the existence of two conspiracies, the government still presented substantial evidence that Mendiola was a member of Adame's distribution conspiracy until December 2011 and that in 2012 Adame sold distribution quantities of methamphetamine to members of Mendiola and Gutierrez's group on multiple occasions. See Garcia-Hernandez, 530 F.3d at 661. Further, there is evidence that around August 2012 Gutierrez supplied methamphetamine to Adame and that Gutierrez and Adame jointly sold a distribution-quantity of methamphetamine to a third party. See id. The government's evidence thus sufficiently established that Adame and Gutierrez participated in both conspiracies that allegedly were proved at trial. "In a case where the evidence shows that the defendant was a member of each proven conspiracy, the danger of prejudicial spillover is minimal, if non-existent." United States v. Pizano, 421 F.3d 707, 720 (8th Cir. 2005) (internal quotation omitted). Furthermore, the district court gave the jury the Eighth Circuit Model Jury Instruction on single versus multiple conspiracies, which "provided strong protection against prejudice from any spillover evidence." United States v. Barth, 424 F.3d 752, 760 (8th Cir. 2005); see Eighth Circuit Manual of Model Jury Instructions–Criminal § 506B (2014 Ed.). Accordingly, Adame and Gutierrez have failed to establish that they were prejudiced by the supposed variance.

### 2. Adame's Methamphetamine Distribution Count

We also conclude there was sufficient evidence to support Adame's conviction on the methamphetamine distribution count. In order to obtain a conviction under 21 U.S.C. § 841(b)(1), the government was required to prove that Adame knowingly and

intentionally distributed 50 grams or more of methamphetamine. 21 U.S.C. §§ 841(a)(1) and 841(b)(1). "Courts have interpreted the term 'distribute' . . . quite broadly to include not only the transfer of physical possession, but also other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price." United States v. Luster, 896 F.2d 1122, 1127 (8th Cir. 1990) (internal quotation omitted).

Here, the government provided ample evidence that Adame was intimately involved in the methamphetamine transaction that occurred on May 4, 2011. The government introduced footage of a CI and Adame negotiating the price of three ounces of methamphetamine and discussing when payment would be made. The CI further testified that she made a partial payment to Adame and then later met with Mendiola to collect the methamphetamine. The government introduced footage of the meeting with Mendiola, as well as three ounces of methamphetamine that Mendiola provided to the CI during the meeting. This evidence was more than sufficient to prove that Adame distributed over 50 grams of methamphetamine on May 4, 2011. Accordingly, the district court did not err in denying Adame's motion for judgment of acquittal with respect to count 5 of the indictment.

## B.  Sanchez

Sanchez challenges several of the district court's evidentiary rulings and argues there was insufficient evidence to support his convictions on the conspiracy and distribution counts. Sanchez also contends that his counsel provided ineffective assistance. For the reasons stated below, we find his arguments unpersuasive.

### 1.  Evidentiary Rulings

Sanchez argues the district court erred in allowing certain testimony by the DEA agent involved in the investigation in reference to the footage of the July 27 and

August 13 controlled buys. Sanchez also asserts that Exhibit 2.14 should not have been admitted into evidence. "[W]e review a district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." United States v. Picardi, 739 F.3d 1118, 1126 (8th Cir.) (quotation omitted), cert. denied, 134 S. Ct. 2852 (2014).

With respect to the footage of the July 27th Buy, Sanchez argues that the agent's identification of the persons depicted in the video invaded the province of the jury. However, Sanchez acknowledges that the video is blurry and that it is somewhat difficult to identify the persons depicted therein.[6] "Under Federal Rule of Evidence 701, '[a] witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'" United States v. Anderson, 783 F.3d 727, 746 (8th Cir. 2015) (alteration in original) (quoting United States v. Farnsworth, 729 F.2d 1158, 1160 (8th Cir. 1984)). Relevant considerations include "whether the witness was familiar with the defendant's appearance around the time that the surveillance photograph was taken . . . and whether the surveillance photograph made it difficult for the jury to make a positive identification of the defendant." Id. at 747. Given the relatively low quality of the footage and the agent's extensive surveillance of Sanchez during and around the time of the July 27th Buy, it is clear that the agent was "more likely to correctly identify [Sanchez] from the" footage than was the jury. Id. at 746 (quotation omitted). Accordingly, the district court did not clearly abuse its discretion in allowing the testimony to identify the persons depicted in the footage of the buy.

---

[6]Sanchez did not object to the government's introduction of this footage into evidence but instead merely challenges the agent's commentary about the footage.

We also hold the district court did not abuse its discretion in allowing the same agent to testify that the CI's use of the term "one" during the phone call that preceded the August 13th Buy meant that he wanted to purchase one ounce of methamphetamine. The agent was intimately familiar with "the modus operandi of [the] drug dealers" he was investigating and was highly qualified to help the jury understand "the meaning of jargon" used during drug transactions. United States v. Placensia, 352 F.3d 1157, 1164-65 (8th Cir. 2003). Further, the agent's testimony was apparently based on his personal knowledge of the quantity of methamphetamine the CI had been instructed to purchase. See id. Accordingly, the district court did not err in permitting the agent to explain the meaning of terms the CI used during the phone call. Similarly, the district court did not abuse its discretion in allowing the agent to testify that, based on his personal knowledge of the events in question, Sanchez and Calderon did not provide drugs to the CI during their first meeting with him because they did not have any methamphetamine with them. Thus, we conclude this evidence was properly admissible. Finally, Sanchez offers no persuasive argument as to why Exhibit 2.14 should have been excluded, and we hold the district court did not clearly abuse its discretion in admitting this evidence. See United States v. Harris, 493 F.3d 928, 931 (8th Cir. 2007) ("arguments about the accuracy of the identification go to the weight of the evidence").

## 2. Sufficiency of the Evidence

Sanchez next asserts the government failed to provide sufficient evidence that he aided and abetted in the distribution of methamphetamine or that he conspired with others to do so. As noted above, Sanchez failed to file any post-verdict motions challenging the sufficiency of the evidence. See Fed. R. Crim. P. 29(c) (motion for judgment of acquittal) and 33(a) (motion for a new trial). We therefore review the district court's failure to grant Sanchez a judgment of acquittal based on the sufficiency of the evidence for plain error. See Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the

-14-

court's attention."). "To establish plain error, [Sanchez] bears the burden of establishing that the district court's failure to grant [him a judgment of acquittal] sua sponte was (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Martinson, 419 F.3d 749, 752 (8th Cir. 2005) (internal quotation omitted); see Fed. R. Crim. P. 29(a) ("The court may on its own consider whether the evidence is insufficient to sustain a conviction."). We find no plain error here.

With respect to the distribution counts, "[t]here are three elements for aiding and abetting distribution of controlled substances: (1) the defendant associated [himself] with the unlawful venture; (2) the defendant participated in it as something [he] wished to bring about; and (3) the defendant sought by [his] actions to make it succeed." United States v. Ellefson, 419 F.3d 859, 863 (8th Cir. 2005) (internal quotation omitted). Because the evidence supporting the distribution charges involved Sanchez's presence at the controlled buys with Calderon, the evidence must also show that Sanchez "shared in [Calderon's] criminal intent." United States v. Santana, 524 F.3d 851, 855 (8th Cir. 2008). On appeal, Sanchez argues the government's evidence merely proved he was present during the controlled buys but failed to establish that he affirmatively participated in the transactions or even knew they were occurring. See Ellefson, 419 F.3d at 863 (noting that neither mere presence at a crime nor knowledge that a crime was to be committed is sufficient to establish aiding and abetting). The footage from the five controlled buys strongly cuts against Sanchez's innocent bystander argument. This footage indicates Sanchez, at a minimum, was present while the CI and Calderon negotiated the sales and that Sanchez counted drug money. Furthermore, footage from the July 27th Buy appears to depict Sanchez actually giving methamphetamine to the CI. Based on this evidence, a reasonable jury could have concluded that Sanchez intentionally associated himself with the distribution offenses and actively sought by his actions to make them succeed. Id.

We similarly reject Sanchez's argument that there was insufficient evidence to prove that he was a part of the drug distribution conspiracy. Numerous witnesses testified that Calderon regularly delivered methamphetamine and collected money for Adame and that Sanchez drove Calderon around while he conducted these activities. Further, the government offered evidence that Sanchez helped package methamphetamine and personally handled drugs and money during distribution-quantity sales to drug dealers. Based on this evidence, a reasonable jury could have concluded the government proved beyond a reasonable doubt that Sanchez was involved in the drug distribution conspiracy charged in the indictment. United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

Finally, with respect to Sanchez's ineffective assistance of counsel argument "[w]e generally do not address claims of ineffective assistance of counsel on direct appeal because such claims are better addressed through collateral proceedings." United States v. Wohlman, 651 F.3d 878, 887 (8th Cir. 2011) (quotation omitted). "They may be heard only if a miscarriage of justice would otherwise result . . . or if the district court has developed a record on the issues." United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004). Sanchez "has not shown that the record is sufficiently developed to address his ineffective assistance arguments or that a miscarriage of justice will result if we decline to do so at this juncture." Wohlman, 651 F.3d at 887. Accordingly, we decline to consider his ineffective assistance claim.

## III.   CONCLUSION

For the reasons stated above, we affirm the defendants' convictions.

_____